WO

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

The United States of America,      )
                                   )
              Plaintiff,           )          CV 09-178 TUC DCB
v.                                 )
                                   )          **FINDINGS OF FACT AND**
Fernando Arango,                   )          **CONCLUSIONS OF LAW**
                                   )
              Defendant.           )
_____)

Plaintiff brings this action under 8 U.S.C. § 1451(a) to revoke and set aside the order admitting Defendant Fernando Arango (Arango) to United States citizenship and to cancel his certificate of naturalization.  On December 2 and 3, 2014, this action was tried before this Court, sitting without a jury.  The Court having heard the testimony and having examined the proofs offered by the parties, and having heard the arguments of counsel and being fully advised herein, the Court now finds generally in favor of Plaintiff and against the Defendant, and hereby makes the following special Findings of Fact and Conclusions of Law pursuant to the Federal Rules of Civil Procedure, Rule 52(a) and (c) which constitutes the decision of the Court herein:

## FINDINGS OF FACT

To the extent these Findings of Fact are also deemed to be Conclusions of Law, they are hereby incorporated into the Conclusions of Law that follow.

**A.   Arango's Sham Marriage**

1. Arango was born in Cali, Columbia in 1954.  (Stipulation (Doc. 111) ¶ 1.  He originally came to the United States in 1972 on a student visa, *id.* ¶ 2; he returned in 1973 to the United States for approximately two years on a new student visa to attend college in

New York State and graduated in 1975, *id.* ¶ 3. After graduating, Arango obtained a Canadian student visa to attend Ryerson University in Toronto, Canada, for four years. Arango's Canadian student visa expired in 1980. *Id.* ¶ 4.

2. In 1979, while Arango was still living in Canada, Arango's sister, Amparo Valbuena, a.k.a. Amparo Arango ("Valbuena"), told Arango he could become a lawful permanent resident by marrying a U.S. citizen, and that she knew a man, Miguel Diaz ("Diaz"), who would arrange a marriage for Arango.

3. Valbuena had obtained her permanent resident status through Diaz's marriage fraud ring in May 1979. She paid Diaz and one of his associates to handle the immigration paperwork and arrange her marriage to a U.S. citizen named Eladio Santiago ("Santiago"). Valbuena was aware at the time that it was illegal to obtain her immigration status in this manner.

4. Arango knew in 1979 that Diaz would arrange his marriage to a U.S. citizen in exchange for payment, as Diaz had done for Valbuena. Around December 1979, Arango paid $2,000 to Valbuena to give to Diaz and paid another $1500 in February, 1980. (P's Ex. 11.)

5. Diaz applied for a marriage license in New York as Arango by pretending to be Arango at the marriage license bureau and forging Arango's signature on the Affidavit and Application for License to Marry. Arango did not go to the marriage license bureau himself to apply for a marriage license. *Id.* ¶ 6.

6. On March 21, 1980, Arango purportedly married Vicky Tirado ("Tirado"), a U.S. citizen. *Id.* ¶ 7. Neither Arango nor Tirado attended the March 21, 1980, wedding ceremony. *Id.* ¶ 8. Arango knew that Diaz had stood in as him at the March 21, 1980, wedding ceremony. Valbuena stood in as Tirado during the March 21, 1980, wedding ceremony. Arango never met Tirado in person. *Id.* ¶ 9. Arango never lived with Tirado. *Id.* ¶ 10.

7. From 1975 through the duration of his purported marriage to Tirado, Arango was in a romantic relationship with a woman who was a Canadian citizen and who resided in Canada.

8. Arango and Tirado did not intend to establish a life together at the time of the purported marriage, therefor, Arango's marriage to Tirado was a sham.

**B. Arango's Permanent Resident Status**

9. On April 7, 1980, Tirado (or someone pretending to be Tirado) filed with the Immigration and Naturalization Service ("INS")[1] a Petition to Classify Status of Alien Relative for Issuance of Immigrant Visa, Form I-130, on Arango's behalf. *Id.* ¶ 11.

10. Along with the Form I-130, Tirado (or someone pretending to be Tirado) submitted a putative certificate of marriage memorializing the marriage between Arango and Tirado. *Id.* ¶ 12.

11. On the Form I-130, Tirado (or someone pretending to be Tirado) identified Arango as her spouse, *id.* ¶ 13, claimed that, from March 21, 1980, through March 23, 1980 (i.e., the weekend of the purported wedding), she and Arango lived together at 82-66 159th Street, Jamaica, New York, *id.* ¶ 14, and claimed Tirado resided at 82-66 159th Street, Jamaica, New York, *id.* ¶ 15.

12. Valbuena resided at 82-66 159th Street, Jamaica, New York, in March 1980when the I-130 Alien Relative for Issuance of Immigrant Visa form was filed with the INS; Tirado did not live at that address with Valbuena.

13. The INS approved Tirado's Form I-130 on April 22, 1980. *Id.* ¶ 16.

14. On November 4, 1980, Arango filed a State Department Optional Form 230, Application for Immigrant Visa and Alien Registration, Form 230.  *Id.* ¶ 17.

---

[1]The INS ceased to exist as an independent agency within the United States Department of Justice and its functions moved to the Department of Homeland Security("DHS") on March 1, 2003. *See* Homeland Security Act of 2002, Pub.L.No. 107-296, 110 Stat. 2135 (Nov. 25, 2002).

15. On his Form 230, Arango claimed that he was eligible for an immigrant visa based on the approved Form I-130, as the spouse of a U.S. citizen, *id.* ¶ 18, listed Tirado as his wife, *id.* ¶ 19, stated that his purpose in going to the United States was to join his wife, *id.* ¶ 20, and stated that he lived at 82-66 159th Street, Jamaica, NY, when he really still lived in Canada, *id.* ¶ 21.

16. In conjunction with Arango's Form 230, Tirado (or someone pretending to be Tirado) filed an Affidavit of Support, Form I-134, with the INS, which: (1) identified Tirado's residence at the time as 82-66 159th Street, Jamaica Hills NY; (2) identified Arango as her spouse; and (3) stated that the reason she was submitting the affidavit was "[t]o enable my husband Fernando to join me permanently in the United States." (P's Ex. 3)

17. On November 4, 1980, a consular officer interviewed Arango in person in Toronto, Canada. *Id.* ¶ 22.

18. Arango swore under oath that all of the statements in the Form 230 were true and complete. (P's Ex. 4 at 4.)

19. The State Department approved Arango's Form 230 on November 4, 1980, and Arango was admitted to the United States as a permanent resident on December 1, 1980. *Id.* ¶ 23.

20. Arango divorced Tirado on March 27, 1984, by commencing a legal action in Dade County Circuit Court in Florida. Arango served Tirado with legal process by publishing a notification in a newspaper because he did not know her whereabouts. The divorce was granted by default against Tirado. *Id.* ¶ 24.

**C.  Arango's Sworn Statement to INS Re: Diaz Marriage Fraud Ring**

21. Former INS Senior Special Agents Gary Hittelman ("Agent Hittelman") and Peter Candemeres ("Agent Candemeres") worked for the INS in its New York, NY, office and led an INS's investigation into the marriage fraud ring Diaz orchestrated and operated.

Agents Hittelman and Candemeres were tasked with developing a criminal case against Diaz and others, including both Arango and Valbuena.

22. Former Program Manager with U.S. Immigration and Customs Enforcement("ICE") Charles Ferrigno ("Agent Ferrigno"), who in 1982 was a junior investigator in the INS's office in New York, NY, assisted Agents Hittelman and Candemeres.

23. Valbuena had worked with Diaz to further the marriage fraud ring; thus, she was an important witness in the case against Diaz. As such, Agents Hittelman and Candemeres interviewed Valbuena on multiple occasions in connection with their investigation.

24. On March 1, 1982, Valbuena met with Agents Hittelman and Candemeres at the INS office at 26 Federal Plaza, New York, NY, dictated and signed a sworn statement, admitting, *inter alia*, that: (1) because her student visa would soon expire, she knowingly paid a marriage broker associated with Diaz to arrange a sham marriage to Santiago;(2) she then applied for and received her permanent resident status on the basis of that sham marriage; (3) she never resided with Santiago; and (4) after she obtained her permanent resident status, she drove Diaz and other individuals around in connection with Diaz's marriage fraud ring, and she referred other individuals to Diaz to arrange sham marriages for immigration benefits.

25. On May 21, 1982, Diaz pleaded guilty to one count of conspiracy to violate 18U.S.C. § 1001 (false statement), five counts of violating 18 U.S.C. § 1001 (false statement), and one count of violating 18 U.S.C. § 1505 (obstruction). Diaz was sentenced on July 29, 1982, to 2 years' imprisonment, with 5 years' probation thereafter, and fined $30,000. *Id.* ¶ 25.

26. Agent Hittelman prepared an investigation report on August 13, 1982,discussing the Diaz investigation and the marriage fraud ring conspiracy. In his report, Agent Hittelman identified the primary participants in the scheme, described the scheme generally, and

explained that the INS intended to initiate administrative immigration proceedings against aliens who had either obtained permanent residence status or a visa as a result of a sham marriage to a U.S. citizen, or were in the process of doing so. (P's Ex. 14.)

27. Agent Ferrigno testified that Agent Hittelman was attempting to get the aliens who had received their status through the marriage fraud ring deported and was very frustrated because he couldn't get any action from the higher-ups who made the decision that work force requirements didn't permit that to be done.

28. On September 15, 1982, after Diaz had been convicted and sentenced, Agents Hittelman and Candemeres met with Arango and he dictated a sworn statement admitting: "My true & correct name is Fernando Arango. I was born on August 22, 1954 in Cali, Colombia. I am a native + citizen of Colombia. I last entered the US as a permanent resident of the US on August 22 [corrected to August 26], 1982. Before I became a residence, I came as a student from Canada. In 1979 my sister Amparo told me I could become a resident by marrying a citizen. She said she knew a man who would arrange it. I'd have to pay about $2500 to him. I wouldn't have to live with the girl. Around December of 1979 I paid $2000 to Amparo to give to Miguel Diaz & around Feb, 1980 I paid another $1500. I never met Miguel or Vicky Tirado, my wife. I never got married. Somebody else took my place at the marriage bureau. My sister told me Miguel Diaz took my place at the ceremony. Amparo gave me all the Immigration papers from Miguel & I went to the American Consulate in Toronto for my green card." (P's Ex. 11.)

29. Agents Candemeres and Hittelman both remember the Diaz investigation. They also both specifically remember Valbuena, who was a more important witness than Arango.

30. The U.S. Attorney prosecuting Diaz was prepared to grant Valbuena criminal immunity in exchange for her cooperation in the Diaz investigation, but he did not do so. That criminal immunity would not have extended to grant Valbuena immunity from any

administrative immigration proceedings, and it would not have provided Arango with any immunity whatsoever.

31. Valbuena played a more important role in the Diaz investigation because Valbuena worked with Diaz to further the marriage fraud ring; she received her permanent resident status; she handled immigration paperwork for Diaz, and she drove Diaz and other aliens in connection with the marriage fraud ring. Arango does not recall ever meeting Diaz.

32. Agents Hittelman, Candemeres and Ferrigno have never seen or heard of a cooperation agreement offering an alien immunity from immigration proceedings in exchange for the alien's cooperation in an investigation.

33. Agents Hittelman, Candemeres and Ferrigno have never offered any alien a verbal or written cooperation agreement offering any immunity from immigration proceedings, or offering the ability to naturalize despite an alien's ineligibility to do so, in exchange for the alien's cooperation in an investigation.

34. Valbuena assumed that she would be permitted to remain in the United States in exchange for her cooperating with the INS regarding the Diaz investigation. But Valbuena never asked the INS for anything in return for her cooperation. Nor did Agents Hittelman, Candemeres and/or Ferrigno enter into a written or oral cooperation agreement with Valbuena allowing her (or Arango) to remain in the United States or naturalize in exchange for her cooperation.

35. According to Arango when he and his sister decided to proceed with their naturalization, Agent Hittelman affirmed there would be no problem. Arango's testimony conflicted with Valbuena's testimony that Agent Hittelman changed the subject when she questioned him about whether she could proceed with naturalization. The August 13, 1982, Investigation Report by Hittelman and testimony from witness Ferrigno that Hittelman expected criminal and deportation proceedings would be instituted with respect to the aliens who were party to the scheme., support Valbuena's testimony.  The Court finds Arango's

testimony to be not credible in respect to the existence of a cooperation agreement between himself and the United States.

36. Agents Hittelman, Candemeres and/or Ferrigno did not enter into a written or oral cooperation agreement with Arango allowing him to remain in the United States or naturalize in exchange for his cooperation.

**D. Arango's Naturalization**

37. On June 13, 1988, Arango filed with the INS an Application for Naturalization, Form N-400, *id.* ¶ 28, signed by Arango on March 30, 1988, *id.* ¶ 29.

38. Question 23 of his Form N-400 asked for the total number of times Arango had been married. Arango left the answer to this question blank. *Id.* ¶ 30.

39. Question 23 required Arango to list any former spouses and to provide the dates of any such marriage, divorce, the way the marriage ended, and the former spouse's INS status, *id.* ¶ 31; Arango answered that he had been married to Tirado from March 21, 1980, until March 27, 1984, *id.* ¶ 32.

40. In response to Question 51 on his Form N-400, Arango stated that he had never provided false testimony to obtain an immigration benefit. *Id.* ¶ 33.

41. In connection with his Form N-400, Arango filed with the INS a Biographic Information Form, Form G-325, signed on March 29, 1988, which identified Vicky Tirado as his former wife, and indicated that they had: (1) been married on March 21, 1980; and (2) divorced on March 27, 1984. (P's Ex. 6.)

42. On June 15, 1989, Johnnie Fripp, who was at that time a District Adjudications Officer with the INS ("DAO Fripp"), interviewed Arango regarding his Form – 400 application for citizenship. She placed Arango under oath at the beginning of the interview, and asked him to review, confirm or correct his answers to the questions on the Form N-400. (P's Ex. 5.)

43. Consistent with her standard practice as required by the Adjudicator's Field Manual and in accordance with her training, each time Arango confirmed an answer she checked it in red pen and if he provided an oral answer that differed from that which he wrote on his Form N-400, Fripp used a red pen to make annotate the new or corrected answer. *Id.*

44. Arango did not make any corrections to his Form N-400 regarding his marriage, except to add "1" in response to Question 23, asking how many times Arango had been married. *Id.*

45. Arango answered no to Question 28, which asked whether he had knowingly committed any crime for which he had not been arrested.  (P's Ex. 5: Form N-400 at 3.) arrested

46. At the conclusion of the interview, Arango signed a sworn statement averring that the contents of his Form N-400 were true to the best of his knowledge and belief. *Id.* ¶ 34.

47. The INS approved Arango's Form N-400 on June 15, 1989. *Id.* ¶ 35.

48. Arango filed a Petition for Naturalization, Form N-405, with the United States District Court for the Southern District of Florida on June 15, 1989. *Id.* ¶ 36.

49. On September 12, 1989, Arango took the oath of allegiance at a naturalization ceremony, was admitted to United States citizenship, and received Certificate of Naturalization No.14208736. Id. ¶ 37.

50. During Arango's citizenship interview, DAO Fripp possessed a temp-alien file from Miami, Florida for Arango; she did not possess Arango's originating file from New York, NY, which contained his September 15, 1982, sworn affidavit admitting the fraudulent marriage to Tirado.

51. It was typical to conduct interviews for citizenship using temporary files while awaiting receipt of a permanent file because it could take up to a year to receive the permanent file.  Waiting for the permanent file would create a back log so the naturalization

proceedings moved forward even to the point of the naturalization ceremony, with the protocol being for the temporary file to be consolidated with the permanent file upon its receipt, with the alien's file reviewed at that time for any derogatory or problematic information to be referred for investigation.

52. In Arango's case the permanent New York A-file was ordered by the Miami INS office on June 13, 1988.  It had not arrived at the time of the citizenship interview, therefore, DAO Fripp was relying on Arango's statements at the interview.  The New York and Miami files had not been consolidated in 2004 when the Miami A-file was obtained by Agent Ward during a criminal investigation of Arango for a drug offense. (P's Ex. 10.)

53.  The INS's record-keeping system was imperfect, particularly in 1982. As a result, although Arango's September 15, 1982, affidavit was filed in his alien file originating in New York, NY, the INS did not consolidate that alien file with Arango's Miami, Florida, alien file.

54. Arango did not ask DAO Fripp if she had reviewed his file regarding how he had obtained his legal permanent residence status, i.e., green card, or if she knew he had met with INS investigators in New York about this.  If he had made these inquires, she would have been required her to ask followup questions, which if answered truthfully by Arango, would have required her to discontinue the interview due to his sham marriage to Tirado.  She did not discontinue the interview.

55. Arango deliberately did not inform DAO Fripp that his marriage to Tirado was fraudulent and that in 1982, he had admitted as much and that it was a sham, and he deliberately failed to correct the misrepresentation on his Form 400 application that he was a legal permanent resident through his marriage to a United States, Tirado.

56. Had Arango told DAO Fripp that he obtained his lawful permanent resident status from a sham marriage, which did not conform with the requisites for a legal marriage, she would have noted that information on his naturalization application, she would not have

recommended granting his naturalization application, she would have discontinued his interview and referred his application for investigation into his bad moral character based on his having entered into a fraudulent marriage.

57. Because DAO Fripp did not have the information that Arango's marriage was not legally binding and a sham, she recommended citizenship because he was a lawful permanent resident, through marriage to a United States citizen, Tirado, lasting for three years, and residing in the United States for five years.

58. Because the INS did not have the information that Arango's marriage was not legally binding and a sham, on September 12, 1989, Arango' Petition for Naturalization was granted, he took the oath of allegiance, and was admitted to United States citizenship and received Certificate of Naturalization No.14208736. *Id.* ¶ 37.

**E.  Arango's Federal Employment, Criminal Conviction, and Denaturalization**

59. Arango became a Border Patrol Agent in 2003.

60. In confirming Arango's status as a U.S. citizen, a prerequisite for his employment with the United States Customs and Border Protection (CBP), CBP confirmed that Arango possessed a certificate of naturalization that had not been forged and that bore his identity.

61. In 2005, Arango was arrested for attempted possession with intent to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(ii)(II) and 846. *Id.* ¶ 38.

62. On February 13, 2007, Arango was sentenced to nine years in prison for attempted possession with intent to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1),841(b)(1)(A)(ii)(II) and 846. *Id.* ¶ 39.

63. Stanley Ward, former Senior Special Agent with the United States Immigration and Customs Enforcement (ICE) in the Office of Professional Responsibility ("Agent Ward"), was the primary investigator assigned to Arango's criminal drug investigation.

64. As part of his investigation regarding Arango, Agent Ward interviewed Arango on multiple occasions. At no time during those interviews did Agent Ward learn of Arango's sham marriage, or any cooperation agreement between Arango and/or Valbuena and any INS agent that would have permitted Arango to naturalize despite that he obtained his permanent resident status through a sham marriage.

65. During his investigation, Agent Ward ordered Arango's alien file from the INS office in Miami, Florida.  The Miami alien file did not contain Arango's September 15, 1982, affidavit, or any other evidence that Arango's marriage to Tirado was a sham.

66. During his investigation, Agent Ward learned that Arango had a second alien file, which originated at the INS office in New York, NY. He obtained the New York alien file, which contained Arango's September 15, 1982, affidavit admitting that his marriage to Tirado was a sham.

67. Agent Ward served the Complaint because he was in the best position to evaluate any information Arango might volunteer regarding other "dirty" border patrol agents.  Agent Ward did not threaten to serve the Immigration Complaint unless Arango cooperated: Arango plead guilty December, 2006, was sentenced in 2007, (CR 05-2033 TUC CKJ, Plea Agreement (Doc. 17,18), the Judgment of Commitment (Doc. 24) issued on February 13, 2007, and the Immigration Complaint was filed on March 30, 2009, and served on Arango on April 8, 2009. (CV 09-178 TUC DCB, Complaint (Doc. 1); Return of Service (Doc. 6)).[2]

## CONCLUSIONS OF LAW

To the extent any of the Findings of Fact contain or include any Conclusions of Law, said Findings of Fact are incorporated herein by reference.

---

[2] Agent Ward testified from memory at trial that he served the Immigration Complaint in 2006, subsequent to Arango's conviction, but prior to sentencing.  Under such circumstances, he testified it was his practice to sometimes suggest that a sentencing benefit might be available under Rule 32 for cooperation.

**A.   Arango Illegally Procured his Citizenship.**

1. This is an action under section 340(a) of the Immigration and Nationality Act of 1952 (INA), to revoke and set aside the order admitting Defendant Fernando Arango to citizenship and to cancel Defendant's certificate of naturalization, with an affidavit showing good cause for this action provided by Stanley Ward, a Senior Special Agent of ICE. (Complaint to Revoke Naturalization (Doc. 2) (citing 8 U.S.C. § 1451(a)).  The Court has jurisdiction pursuant to 28 U.S.C. § 1345.

2. To prevail in a denaturalization proceeding, the government must prove its case "by clear, unequivocal, and convincing evidence which does not leave the issue in doubt." *Klapprott v. United States*, 335 U.S. 601, 612 (1949).

3. Congress authorized the government to seek denaturalization for a naturalized citizen who either: (1) illegally procured his naturalization; or (2) procured his naturalization by concealing material facts or by willful misrepresentation. 8 U.S.C. § 1451(a).

4. An individual has "illegally procured" citizenship if he was statutorily ineligible to be naturalized when he became a naturalized citizen. See *Fedorenko v. United States*, 449 U.S.490, 506 (1981).

5. An individual has procured his naturalization by either concealment or misrepresentation, if the concealment or misrepresentation was willful, and if the fact at issue was material. *Kungys v. United States*, 485 U.S. 759, 767 (1988)(citing *Fedorenko*, 449U.S. at 507n.28).

6. When a court determines the government has met its burden of proving that a naturalized citizen obtained his citizenship illegally, or by willful concealment or misrepresentation, it lacks discretion to excuse the conduct, and it must enter a judgment of denaturalization. *Fedorenko*, 449U.S. at 517(citing 8 U.S.C. § 1429).

7. Whether an alien is "lawfully" admitted for permanent residence is an issue of law. *Monet v. INS*, 791 F.2d 752, 753 (9th Cir. 1986), and connotes compliance with substantive legal requirements, not mere procedural regularity, *id.* 754.

8. "Lawfully admitted for permanent residence" means "the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws, such status not having changed." 8 U.S.C. § 1101(a)(20).

9. Failure to strictly comply with any of the congressionally imposed prerequisites to the acquisition of citizenship renders the citizenship "illegally procured," and naturalization that is unlawfully procured can be set aside. *Fedorenko*, 449 U.S. at 506; *see also United States v. Dang*, 488 F.3d 1135, 1139 (9th Cir. 2007)(indicating that courts have no discretion in excusing conduct and must enter a judgment of denaturalization if the government sustains its burden).

10. An alien who gained his lawful permanent resident status in an unlawful manner, or who was ineligible for such status, is not "lawfully admitted for permanent residence." *Monet*, 791 F.2d at 754; *Lai Haw Wong v. INS*, 474 F.2d 739, 741 (9th Cir. 1973)(upholding BIA's decision that aliens who were admitted for permanent residence in error on visas for which they were not eligible, were not conferred a "lawful" status and were not "lawfully admitted for permanent residence").

11. In other words, mistake or fraud cannot secure lawful status; citizenship conferred upon misconceptions or misrepresentations is not lawful. *Valerio v. INS*, 86 F. Supp2d 1009, 1013 (Hawaii 1999) (distinguishing *Monet* and *Lai Waw Wong*).

12. A United States citizen may seek to classify his alien spouse as an immediate relative by filing a Form I-130. 8 U.S.C. §1154(a)(1)(A)(i). Upon the government's approval of the Form I-130, the alien spouse is eligible to apply for lawful permanent resident status.

14

See 8 U.S.C. § 1255(a).  Once "immediate relative"status is conferred, an immigrant visa issues.  8 U.S.C. § 1151(b)(2)(A)(i).

13. A sham marriage cannot confer immigration benefits, including permanent resident status, to an alien spouse. See 8 U.S.C. §1154(c); *Biggs v. INS*, 55 F.3d1398, 1401(9th Cir. 1995)(holding that an alien who obtained lawful permanent resident status through a fraudulent marriage was not lawfully admitted).

14. A marriage is a sham "if the bride and groom did not intend to establish a life together at the time they were married." *United States v. Orellana-Blanco*, 294 F.3d 1143,1151 (9thCir. 2002)(quoting *Bark v. INS*, 511 F.2d1200, 1201 (9th Cir. 1975)); *see also United States v. Arango*, 670 F.3d 988, 993 n.2 (9th Cir.2012) ("If Arango was not a lawful permanent resident at the time of his naturalization because of his fraudulent marriage, then his citizenship was illegally procured.").

15. Arango testified that he married Tirado because marrying a United States citizen was the fastest and easiest way to get his citizenship, he and Tirado never met, not even on the day of the purported marriage, never lived together, and after four years when he filed for divorce he served her by publication because he had no knowledge of her whereabouts.

16. Arango's marriage to Tirado was a sham because he and Tirado did not intend to establish a life together at the time they were married. *Orellana-Blanco,* 294 F.3d at 1151 (quoting *Bark*, 511 F.2d at 1201 (9th Cir. 1975) (explaining motivation for marriage as evidence of intent, therefore, motive to marry to get a green card may raise inference of sham, but sham arises from intent to not establish a life together).

17. Under New York law, individuals who intend to marry must, in accordance with New York law, obtain a marriage license and deliver it to the officiant of the marriage ceremony, N.Y. Domestic Relations Law § 13 (McKinney 1977), each applicant must, in person, sign and verify a statement or affidavit containing personal identifying information, *id.* § 15, a marriage must be solemnized by, among other things, the spouses entering into a

written contract of marriage, signed by both spouses and at least two witnesses and acknowledged before a judge "of a court of record of" NewYork by the spouses and witnesses, *id.* § 11(4).

18. Under New York law, the spouses "must solemnly declare in the presence of a clergyman or magistrate and the attending witnesses that they take each other as husband and wife," and at least one witness must be present at the ceremony. *Id.* § 12.

19. The purported marriage between Arango and Tirado on March 21, 1980, was not a legal marriage because neither Arango nor Tirado attended the marriage ceremony in New York. Instead, Diaz stood in as Arango, and Valbuena stood in as Tirado. Arango did not procure the marriage license; Diaz fraudulently procured the licence.  The personal identifying information was false in regard to Arango's address being at 82-66 159th Street, Jamaica, New York, when he was actually residing in Canada.

20. Pursuant to New York law, a spouse petitioning for divorce may serve the divorce petition and summons on his or her spouse by publication "if service cannot be made by another prescribed method with due diligence." New York Domestic Relations Law §232 (McKinney's1962); New York Civil Practice Law&Rules §§ 314 &315(McKinney's 1962); *see also Caban v. Caban*, 497N.Y.S.2d 175, 176 (N.Y.App. Div. 1986). "[S]ervice by publication should be utilized only as a last resort where all other methods of service are unavailable, including possible methods of expedient service." *Caban*,497 N.Y.S.2d at 176. If the defendant spouse does not appear or plead, the Court may enter judgment in favor of spouse seeking the divorce. New York Domestic Relations Law § 232. Arango served the divorce notice on Tirado by publication.

**B.  Arango Willfully Concealed and Misrepresented a Material Fact**.

21.Additionally, an alien who "by fraud or willfully misrepresenting a material fact…has procured…a visa, other documentation, or other admission to the United States or

other benefit provided under this chapter is inadmissible" to the United States. 8 U.S.C. § 1182(a)(6)(C)(i); 8 U.S.C. § 1182(a)(19) (1980).

22. "This ground for denaturalization 'plainly contains four independent requirements: the naturalized citizen must have misrepresented or concealed some fact, the misrepresentation or concealment must have been willful, the fact must have been material, and the naturalized citizen must have procured citizenship as a result of the misrepresentation or concealment.'" *Arango*, 670 F.3d at 994-995) (quoting *Kungys*, 485 U.S. at 767).

23. Proof of intent to deceive is not required to meet the willfulness element. *See Forbes v. INS*, 48 F.3d439, 442 (9thCir. 1995) (citing *Espinoza-Espinoza* v. INS, 554F.2d 921, 925 (9th Cir. 1977)). Rather, knowledge of the falsity of a representation is sufficient. *Id.*; *Hernandez-Robledo v. INS*, 777F.2d 536, 539 (9th Cir.1985) (the government "need only show that 'the misrepresentation was deliberate and voluntary'")(quoting *Espinoza-Espinoza*, 554 F.2d at 925); *Witter v. INS*, 113 F.3d 549, 554 (5thCir. 1997); *Matter of Healy*, 17 I. & N. Dec. 22, 28 (BIA1979); *see also U.S. v. Nunez-Garcia*, 262 F. Supp. 2d1073, 1085(C.D. Cal.2003)(defendant's misrepresentations were willful where he "spoke, read, wrote, and understood English" and signed the form under penalty of perjury).

24. An alien willfully misrepresents a fact within the meaning of 8 U.S.C.§ 1182(a)(6)(C)(i) if "the misrepresentation was deliberate and voluntary."*Espinoza-Espinoza*, 554 F.2d at 925. "[T]here is no requirement that an intent to deceive must be shown." *Id.*

25. Whether a concealment or misrepresentation is material under section1182(a)(6)(C)(i)"is whether they ha[ve] a natural tendency to influence the decisions of the immigration and Naturalization Service." *Forbes v. INS*, 48 F.3d 439, 442 (9thCir. 1995)(quoting *Kungys*, 485 U.S. at 772), including where honest representations would predictably have disclosed other facts relevant to [the applicant's] qualifications." Id. (internal quotations and citations omitted).

**1. Arango was not a lawful permanent resident**.

26. Arango applied for his immigrant visa and permanent resident status based on his purported marriage to a United States citizen, Tirado, despite his marriage being fraudulent under the laws of New York and a sham marriage.

On his visa application, Form 230, and during his consular interview in Toronto, Canada, Arango voluntarily and deliberately concealed that he was not lawfully married by misrepresenting that Tirado was his wife, that he intended to join her in the United States, that Tirado lived in New York at an address where, in fact, Valbuena resided, but Tirado did not. By this conduct, Arango acted wilfully.

28. Arango's misrepresentations were material because whether or not he was lawfully married to a United States citizen –would have the natural tendency to influence the INS's decision to approve Tirado's Form I-130, Petition to Classify Status of Alien Relative for Issuance of Immigrant Visa, and the State Department's decision to approve Arango's Form 230, Application for Immigrant Visa and Alien Registration, which depended on the approved Form I-130. If Arango had disclosed to the INS or the State Department that his marriage was a sham during his visa application process, not to mention the fact that he never legally married Tirado, the INS would have been statutorily precluded from approving the Form I-130, or would have been required to revoke the Form I-130 if it had already been approved. See 8 U.S.C. §1154(c). For this reason, Arango procured his visa and lawful permanent resident status as a result of his fraudulent marriage, his concealment of this fact and misrepresentations he made regarding the legitimacy of his marriage.

29. Arango was inadmissible to the United States when he applied for and received lawful permanent resident status. See 8 U.S.C. §1182(a)(6)(C)(i); *see also Cervantes-Gonzales v. INS*, 244 F.3d 1001, 1004 (9th Cir. 2001) (alien inadmissible under section1182(a)(6)(C)(i)because he procured false documents with which he sought to obtain a passport); *King v. Holder*, 570 F.3d 785, 787-88(6th Cir.2009) (holding that even a

previously admitted alien is deportable if the alien committed marriage fraud as defined in *Bark*, 511 F.2d at 1201). Arango was never lawfully admitted to the United States as a permanent resident. He was consequently ineligible to naturalize, and he illegally procured his naturalization. *See Arango*, 670 F.3d at 993.

### 2. No cooperation agreement existed to allow Arango to naturalize.

30. Arango argues that, even if he was not lawfully admitted as a permanent resident, Agents Hittelman and Candemeres entered into a cooperation agreement with him whereby the INS would permit him to remain in the United States and eventually naturalize in exchange for his cooperation and assistance with the ongoing Diaz investigation.

31. The Government can be bound by a cooperation agreement in the immigration context if the person making the promise is authorized to make the promise and the promisee relies on the promise to his detriment. *Thomas v. INS*, 35 F.3d 1332, 1337 (9th Cir. 1994).

32. Agents Hittelman, Candemeres, and Ferrigno testified they had no authority to, and did not, offer Arango any kind of cooperation agreement, either verbally or in writing. Agents Hittelman, Candemeres, and Ferrigno testified they have never offered any other alien such an agreement, or seen their colleagues at the INS do so. The Report of Investigation Agent Hittelman prepared in connection with the Diaz investigation/prosecution, dated August 13, 1982, and Ferrigno's testimony indicated that Hittelman believed the INS would initiate administrative immigration proceedings against aliens who had received visas or lawful permanent resident status as a result of the Diaz marriage fraud ring, as well as those for whom applications and/or petitions were still pending.

33. Agents Hittelman, Candemeres, and Ferrigno, where investigating agents and did not have prosecutorial authority to bind the INS regarding denaturalization. *Cf., United States v. Flemmi*, 225 F.3d 78, 84-87 (1st Cir. 2000) (generally law enforcement officers do not have authority to bind prosecutorial authorities by way of cooperation agreements

because doctrines of estoppel and apparent authority not available to bind the sovereign so there must be actual authority; authority to perform investigatory duties compliments but cannot curb prosecutorial authority).

34. A cooperation agreement would have served little purpose for the Government because Arango could not have played an important role in the Diaz investigation given that, by the time he provided his sworn statement to the INS in September 1982, Diaz had already been arrested, charged, convicted and sentenced.

35. The Court also rejects Arango's assertion that a "cooperation agreement" resulted from the fact that his sister, Valbuena, cooperated with the INS, and that she had negotiated this agreement on his behalf because Valbuena was a more important witness than Arango, and Agents Candemeres, Hittelman and Ferrigno did not offer Valbuena a cooperation agreement. She testified she cooperated without asking for anything in exchange.

36. Arango testified that he went with his sister to speak with the agents in 1982 because they wanted to talk to him. She told him everything had been taken care of and would be ok. According to Arango the agents told him to tell them about his marriage and that his statements were just a formality and he did not need to worry about it. Arango believed that the agents intended to do what they could to keep him and his sister in the United States. Arango's testimony reflects he did not make the 1982 admissions about his sham marriage based on the Government's agreement to allow his naturalization and/or citizenship.

37. Agents Hittelman, Candemeres, and Ferrigno acted within the scope of their investigative authority by obtaining Arango's September 15, 1982 affidavit admitting his sham marriage and placing it in his alien file originating in New York, NY. Agent Hittelman prepared the August 13, 1982, Investigation Report. Higher-ups were responsible for deciding whether to pursue criminal and immigration proceedings against Arango.

38. It "is well settled that the decision to place an alien in immigration proceedings, and when to do it, belongs to the INS . . . and is akin to prosecutorial discretion." *Martinez-Garcia v. Ashcroft*, 366 F.3d 732, 735 (9th Cir. 2004). The fact that Arango was not prosecuted or subject to administrative proceedings as a result of his "marriage" to Tirado is not evidence a "cooperation agreement" existed between Arango and the investigating INS agents or the United States; it reflects a decision "higher-up" that work force factors precluded his prosecution.

39. Arango also claims that the fact that CBP hired him in 2003 evidences the existence of a "cooperation agreement" because CBP was required to vet him and to confirm his citizenship before hiring him. CBP established Arango was a United States citizen by confirming that he had a naturalization certificate that bore his identity. This does not advance Arango's argument.

40. The failure by the Government in not seeking to criminally prosecute Arango and to not rescind his lawful permanent resident status reflects that the INS's record-keeping system was imperfect, particularly in 1982.

**3. Arango willfully concealed and misrepresented his unlawful permanent resident status and that he had engaged in a sham marriage.**

41. To the extent the Ninth Circuit meant it to be law of the case that, "if [Arango] failed to mention his marriage to Tirado on his naturalization application, that would be a willful misrepresentation, because the marriage existed, even if it was later deemed fraudulent," *Arango*, 670 F.3d at 995, that does not preclude this Court's conclusion that Arango deliberately misrepresented and concealed the nature of his marriage during his naturalization interview with DAO Fripp.

42. During the interview, Arango identified Tirado as his former spouse and claimed that they had been married from March 21, 1980, through March 27, 1984; Arango did not disclose any additional information to her concerning his "marriage," such as his sham

marriage confession to the INS in 1982. He did not tell DAO Fripp that his attestation was false on the Form N-400 when he stated he had never previously provided false testimony to obtain an immigration benefit nor did he correct his false answer on the Form N-400 that he had not knowingly committed a crime, even though not arrested, of fraud by entering into the sham marriage with Tirado in violation New York law. Arango made misrepresentations on the N-400, which he deliberately concealed during his interview with DAO Fripp when he failed to correct his false answers.

43. The Court reject's Arango's testimony that he asked DAO Fripp during the citizenship interview if she had reviewed his immigration record and she said yes, and therefore, he assumed she knew about his admission that his marriage to Tirado was a sham. DAO Fripp testified that it was typical to conduct, and in Arango's case she conducted, the citizenship interview with a temporary file. Therefore, if he had asked her if she had reviewed his entire immigration record, she could not have answered affirmatively and would have instead made further inquiry regarding what further information existed outside the temporary file.

44. Arango knowingly misrepresented and concealed the true nature of his marriage because he was a fluent English speaker, carefully went over the questions he had answered on his Form N-400 with DAO Fripp, and she would have answered any questions Arango had about how to answer the questions truthfully. Arango signed the Form N-400 twice: once when he initially filled it out in June1988, and again at the conclusion of his naturalization interview with DAO Fripp on June 15, 1989, when he signed under oath that the contents of his application were true and correct to the best of his knowledge and belief.

45. Arango's failure to disclose the truth of his marriage to DAO Fripp was material to his naturalization application because the fraud had more than a natural tendency to influence the INS – it would have precluded him from naturalizing because he would have been statutorily ineligible to do so: 1) he would not have had a lawful permanent resident

status and 2) he would have been of bad moral character for having engaged in the fraudulent sham marriage.   His disclosures would have caused DAO Fripp to terminate the interview and refer the case for investigation.

46. No statute places a time limit on an action to revoke naturalization. The United States may institute denaturalization proceedings against a defendant at anytime, regardless of how much time has passed since the defendant naturalized. *See Fedorenko*, 449U.S. at 497(seven years); *Kungys*, 485 U.S. at 765 (34 years); *United States v. Szehinskyj*, 277 F.3d 331 (3d Cir.2002) (four decades); *United States v. Costello*, 275 F.2d 355, 356-57( 2d Cir.1960) (27 years).

**4. Arango cannot rely on laches.**

47. "[I]t remains an open question in [the Ninth] circuit as to whether laches is a permissible defense to a denaturalization proceeding." *Dang*, 488 F.3dat 1143-44.

48. The defense of laches requires a defendant to prove "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *Id.* at1444 (citing *Costello*, 365 U.S. at 282).

49. The United States did not lack diligence in filing this denaturalization action against Arango merely because of the number of years that have elapsed since his naturalization. See *Dang*, 488 F.3d at 1144 (citing *Costello*,365 U.S. at 268 (27years); *Kungys*, 485U.S. at 764 (34years); *Fedorenko*, 449U.S. at 497 (seven years)). Depriving an individual "of his fraudulently acquired privilege, even after the lapse of many [(27)]years, is not so unreasonable as to constitute a denial of due process."*Costello*, 365U.S. at 285.

50. Agents Hittelman and Candemeres acted diligently by obtaining Arango's sworn affidavit admitting his sham marriage and placing it in his A-file; the decision to not proceed to revoke Arango's lawful permanent residence status was discretionary.

51. Because of Arango's concealment and misrepresentations regarding his sham marriage, DAO Fripp did not refer his case for investigation.   Given the inaccurate record

keeping system which existed in 1982, the INS acted diligently when it granted Arango's Application for Naturalization based on his representations.

52. The fact that Arango became a Customs officer does not indicate that the United States lacked diligence in initiating denaturalization proceedings because, when Arango was hired as a border patrol agent, Customs confirmed that he had a naturalization certificate that was issued in his name.

53. Once the sham marriage came to the attention of Agent Ward during his criminal investigation into Arango's 2005 drug offense, the United State acted diligently by initiating these alien immigration proceedings in 2009.

54. Removal proceedings are independent from denaturalization actions, and "the decision to place an alien in immigration proceedings, and when to do it, belongs to the INS. . . and is akin to prosecutorial discretion."*Martinez-Garcia*, 366 F.3d at 735 (citing *Cortez-Felipe v. INS*, 245 F.3d1054, 1057 (9th Cir.2001)).

55. The delay in filing for denaturalization did not prejudice Arango in his defense because the evidence of Arango's fraudulent marriage to Tirado reflecting his ineligibility for citizenship – is primarily based on records, the validity of which has not diminished with the passage of time. *See Costello*, 365U.S. at 283.

56. The witnesses' memories were excellent in this case and they were competent to testify regarding the matters upon which they offered testimony.

## CONCLUSION

Based on the above Findings of Fact and Conclusions of Law, the Court finds that Arango was not eligible to naturalize because he was not Vicky Tirado's spouse under the laws of the State of New York and, therefore, was not eligible to obtain permanent residence through her; Arango could not be naturalized under the laws of the United States because he obtained his permanent resident status through a sham marriage and by misrepresentations and concealment; and Arango obtained his naturalization by willfully misrepresenting and

concealing the truth about his sham marriage and that he was not a lawful permanent resident.

**Accordingly,**

**IT IS ORDERED** that the Clerk of the Court shall enter Judgment for Plaintiff the United States and against Defendant Arango.

**IT IS FURTHER ORDERED** that the Court revokes, sets aside, and cancels the Certificate of Naturalization Number 14208736, issued to Defendant on September 12, 1989, and forever restrains and enjoins Defendant from claiming any rights, privileges, or advantages under any document that evidences U.S. citizenship obtained as a result of his naturalization.

**IT IS FURTHER ORDERED** that Defendant's counsel and counsel for Plaintiff or her duly authorized representative are directed to appear before this Court on Monday, January 5, 2015, at 11:00 a.m., in Courtroom 6B, Sixth Floor, Evo A. DeConcini United States Courthouse, 405 W. Congress Street, Tucson, Arizona, for the purpose of surrendering and delivering Defendant's Certificate of Naturalization and any other indicia of his U.S. citizenship (including, but not limited to, U.S. passports, voter registration cards, and other voting documents), and any copies thereof in his possession, to Plaintiff's counsel or her duly authorized representative. Defendant is also directed to recover any such documents and materials that he knows are in the possession of others and to deliver them to his attorney to bring to this hearing for delivery to Plaintiff's counsel or her duly authorized representative. Alternatively, the documents may be delivered to the Government

/////
/////
/////
/////
/////

prior to the above scheduled date and the hearing will be vacated.   Failure to produce this documentation will result in the imposition of sanctions, including an order to the U.S. Marshal Service to immediately bring Defendant before this Court.

DATED this 16th day of December, 2014.

David C. Bury
United States District Judge